David Edward LOVELESS, Appellant,

v.

STATE of Alaska, Appellee.

No. 4977.

Court of Appeals of Alaska.

Oct. 15, 1981.

John R. Vacek, Asst. Public Defender, Kodiak, and Brian Shortell, Public Defender, Anchorage, for appellant.

Peter A. Michalski, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before BRYNER, C. J., and COATS and SINGLETON, JJ.

OPINION

SINGLETON, Judge.

David Loveless was indicted for the first degree murder of Allen Hanson. A jury convicted him of second degree murder and he appealed to the Alaska Supreme Court which reversed his conviction and remanded for a new trial. *Loveless v. State,* 592 P.2d 1206 (Alaska 1979) (*Loveless I* ).

On retrial he was convicted of involuntary manslaughter. He renews his appeal in this court claiming three errors. (1) He contends that the trial court erred in permitting Dr. McIver, a clinical psychologist, to testify regarding a statement made by Loveless during a psychological examination conducted shortly after the homicide wherein Loveless said that the killing was an accident. (2) He contends that the court erred in permitting the case to be tried a second time in light of "prosecutorial misconduct" at the first trial which deprived him of his right under the state [1] and feder-

---

1. Article 1, § 9 states: "No person shall be put in jeopardy twice for the same offense."

al[2] constitutions not to be put twice in jeopardy. A variant of this argument is Loveless' contention that permitting a witness to testify whose absence at the first trial triggered the reversal of his conviction[3] infringed the same constitutional rights. (3) Finally, Loveless contends that certain statements that he made to Robert Henderson, the police officer who accompanied him on his return from Leavenworth, Kansas, should have been suppressed because they had been obtained in violation of the fifth and sixth amendments to the United States Constitution. We have determined that the first error requires reversal, and we remand for a new trial. Some of the other issues may recur, however, and we will discuss them as well. We will set out the facts only to the extent necessary to establish the context in which the issues arose.

### DR. McIVER'S TESTIMONY

Hanson was shot and killed at approximately 11:00 p. m. on August 30, 1974. No one but Loveless saw the shooting, but immediately thereafter, Loveless was seen walking away, shoving a gun into his belt or pants. *Loveless v. State*, 592 P.2d at 1208. Loveless was taken into custody at approximately 2:00 a. m. on August 31, 1974. Fearing he was suicidal, the police had him examined by Dr. William McIver, a clinical psychologist. The examination which was conducted in Loveless' cell lasted forty-five minutes. No *Miranda*[4] warning was given. *Id.*

Dr. McIver testified in rebuttal at Loveless' first trial contradicting Loveless' testimony that he was intoxicated and mentally unbalanced at the time of the shooting. He also testified that Loveless feigned two epileptic seizures.

■ On appeal in *Loveless I*, Loveless contended that the jail house examination absent a *Miranda* warning violated his fifth amendment privilege against self-incrimination. The supreme court agreed that under the circumstances of the interview, Dr. McIver was so closely related to the "police team" that any questioning he conducted concerning the crime should only have occurred after a *Miranda* warning and that any statement by Loveless that he was involved in the killing or that he actually entertained an intent to kill would have to be suppressed. *Id.* at 1209 n.7. However, since an order *in limine* precluded Dr. McIver from revealing any statements made by Loveless concerning the events surrounding the crime, the supreme court found that the testimony of McIver regarding his contact with Loveless was in the nature of "real" or nontestimonial evidence to which the right against self-incrimination does not attach.[5] *Id.* at 1209.

**2.** The fifth amendment provides, in pertinent part: "nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb . . . ." This provision is applicable to the states through the fourteenth amendment. *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969).

**3.** In *Loveless I*, the supreme court reversed on the grounds that Loveless was not given the opportunity to confront James Evans at trial. It appears that the prosecution based a damaging line of questioning on statements made by Evans before the grand jury. *Loveless v. State*, 592 P.2d at 1211–12.

**4.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), *reh. denied*, 385 U.S. 890, 87 S.Ct. 11, 17 L.Ed.2d 121 (1966). There is a full discussion of the applicability of *Miranda* to McIver's testimony in *Loveless I, q. v.* We will not repeat that discussion here given the state's concession at the second trial that *Miranda* warnings were not read prior to McIver's examination of Loveless.

**5.** Loveless wishes reconsideration of this holding, but it is binding on this court under the doctrine of the law of the case, except to the extent that it is inconsistent with *Estelle v. Smith*, —— U.S. ——, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). *See Wolff v. Arctic Bowl, Inc.*, 560 P.2d 758 (Alaska 1977). Loveless may, if he wishes, challenge the earlier decision in a petition for hearing in the supreme court after publication of this opinion. We express no opinion regarding whether McIver's testimony at the second trial violated the limited permission granted in *Loveless I* in other particulars or even whether *Loveless I* survives *Estelle*. Should the supreme court not grant a hearing, these matters may be presented to the trial court in the event that Dr. McIver testifies on retrial.

On retrial, the same order *in limine* was obtained, but the prosecution was allowed, after a motion and hearing out of the jury's presence, to deviate from the order *in limine* to the extent of asking Dr. McIver to testify as follows:

> PROSECUTOR: We're going to depart a little bit from the ground rules, Doctor. Mr. Loveless has indicated that the incident for which he found—you found him in the jail was the result of an accident. Did he say this to you?
>
> McIVER: He did mention an accident to me.
>
> PROSECUTOR: All right. And did he do anything when he said it? ... Did he do anything physical when he said the ...
>
> McIVER: Yes, sir. He put his arms around me and hugged me and moaned.
>
> PROSECUTOR: All right. And then later on, how long did this last, this indication?
>
> McIVER: This happened at least a couple of times whenever the—the issue came up, and there was a strong moan, grabbing me, then immediate letting go and shifting to—to another situation of answering a question or whatever.
>
> PROSECUTOR: Was this an indication to you of some genuine remorse?
>
> McIVER: No, again I—it just added to the—to the general feeling that it was contrived. It was just (witness snaps fingers) switched on and off.

■ The state concedes that this line of questioning was error in light of the supreme court's earlier decision in *Loveless I* but contends that the error was harmless.[6] We are unable to agree that the error conceded was harmless, and we therefore reverse.[7] Before a constitutional error can be deemed harmless, it must be harmless beyond a reasonable doubt. *Chapman v. California*, 368 U.S. 18, 23–24, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705, 710 (1967), *reh. denied*, 386 U.S. 987, 87 S.Ct. 1283, 18 L.Ed.2d 241 (1967); *State v. Hannagan*, 559 P.2d 1059, 1065 (Alaska 1977). Loveless' theory that Hanson unexpectedly grabbed the gun from him causing his own death would have supported a jury finding absolving Loveless of criminal responsibility. We are not convinced beyond a reasonable doubt that the jury's rejection of Loveless' justifiable homicide theory was not based in part on their belief that he previewed that theory to Dr. McIver under circumstances suggesting its falsity. It was only by introducing Loveless' statement that the shooting was accidental, followed by Dr. McIver's specific opinion as to the falsity of this statement,

**6.** The state argues (1) that Loveless testified that the killing was accidental and gave his explanation before McIver testified, (2) that Chief Henderson was permitted to tell the jury that Loveless told him prior to trial that the killing was accidental, (3) that the statements regarding an accident were exculpatory at the time they were made, (4) that any suggestion that Loveless lied about the "accident" was merely redundant in light of McIver's testimony that Loveless contrived his diminished capacity defense, *i. e.*, that Loveless was generally a liar, *and finally*, (5) that the jury found Loveless guilty of manslaughter thus apparently accepting his contention that the killing was accidental, *i. e.*, involuntary.

**7.** In *Loveless I* the court held that Dr. McIver could not testify to any statements by Loveless indicating involvement in the killing. *Loveless v. State*, 592 P.2d at 1209 n.7. In this context, it is wise to remember the specific treatment given "exculpatory" statements in *Miranda*:

> No distinction can be drawn between statements which are direct confessions and statements which amount to "admissions" of part or all of an offense. The privilege against self-incrimination protects the individual from being compelled to incrimnate himself in any manner; it does not distinguish degrees of incrimination. Similarly, for precisely the same reason, no distinction may be drawn between inculpatory statements and statements alleged to be merely "exculpatory." If a statement made were in fact truly exculpatory it would, of course, never be used by the prosecution. In fact, statements merely intended to be exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication. These statements are incriminating in any meaningful sense of the word and may not be used without the full warnings and effective waiver required for any other statement."

*Miranda v. Arizona*, 384 U.S. at 476–77, 86 S.Ct. at 1613–14, 16 L.Ed.2d at 725.

that the prosecution was able to directly discredit the defense theory of accident and to establish expressly that this defense had been purposefully contrived by Loveless from the very outset. This determination requires reversal and remand for new trial.

## DOUBLE JEOPARDY

■■ We reject Loveless' double jeopardy arguments and hold that he was properly retried and that James Evans was properly permitted to testify.

Generally, a defendant waives any double jeopardy claim he might otherwise have by moving for a mistrial, *Piesik v. State*, 572 P.2d 94, 96–97 (Alaska 1977), or by appealing his conviction, *DeSacia v. State*, 469 P.2d 369, 379 n.25 (Alaska 1970). Where a defendant seeks a mistrial because of prosecutorial misconduct, retrial may be barred. *Piesik v. State*, 572 P.2d at 96. Defendant suggests that the same rule should apply where "prosecutorial misconduct" prompts a successful appeal. It is unnecessary for us to decide that question because even if the rule suggested by Loveless applied it would not help him here. *Piesik* requires a finding that the prosecutor's conduct was designed to provoke a mistrial and preclude an acquittal where the prosecutor's case is going badly. Defendant concedes that such a finding cannot be made on this record.

It is unnecessary to decide whether "gross negligence," in the sense that phrase is used in *United States v. Martin*, 561 F.2d 135 (8th Cir. 1977), would preclude retrial because the conduct complained of by Loveless was not "gross negligence." We are unable to find that a reasonable prosecutor would have known that he was committing an error of law likely to result in reversal in

proceeding as he did.[8] At the first trial, the judge found no error at all in the state's actions and one justice on appeal agreed. *See Loveless v. State*, 592 P.2d at 1214 (Connor, J., dissenting in part).

Finally, we do not view the question put to Dr. McIver which causes the instant reversal as gross negligence. Though considered by the supreme court in *Loveless I*, the issue was decided without reference to the specific question asked upon retrial. The prosecutor was not aware of McIver's specific knowledge of Loveless' claim of accident until the time of retrial, and accordingly, he could reasonably have believed that an exception to the supreme court's general holding could exist with respect to this particular line of questioning. The prosecutor took the matter up out of the presence of the jury, and after hearing from the defendant, the trial court permitted the question to be asked. Under these circumstances we find neither purposeful misconduct nor gross negligence. We accordingly conclude that retrial is permitted.

## HENDERSON'S TESTIMONY

Loveless' final contention is that the trial court erred in refusing to suppress certain statements that he made to a police officer assigned to escort him back to Alaska for retrial after his conviction was reversed. Subsequent to his conviction, Loveless was transferred to a federal prison in Leavenworth, Kansas. After reversal, his attorney successfully moved to have him returned to Alaska for trial. During the trip back, Loveless made incriminating statements. Loveless contends that the use of the statements in evidence against him violated his rights under the fifth[9] and sixth[10] amend-

---

**8.** Negligence is conduct which a reasonable person would recognize as creating an unreasonable risk of harm to others. Restatement (Second) of Torts § 282. "Gross negligence" which the Restatement calls recklessness requires a substantially greater risk of harm. *Id.* at § 500. Here the "harm" is the defendant being put through the burden of a second trial as a result of reversal for legal error.

**9.** U.S.Const. amend. V, provides in part: "No person shall . . . be compelled in any criminal

case to be a witness against himself . . . ." This right was held enforceable against the states in *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). A similar provision is found in Alaska Const., art. 1, § 9.

**10.** U.S.Const. amend. VI, provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." A similar provision is found in Alaska Const., art. 1, § 11.

ments to the United States Constitution and the analogous provisions of our state constitution.

At the suppression hearing, Robert Henderson testified that he was currently Chief of Police in Palmer, Alaska, and that on May 17, 1979, he travelled outside Alaska and by pre-arrangement assisted a state trooper in bringing Loveless back to Alaska. Prior to leaving, Henderson met with the district attorney who told him not to talk to Loveless about the case while they were travelling, and if Loveless tried to talk about it, to tell him not to, and if Loveless persisted, to take notes and write a report. Henderson said he followed these instructions, telling Loveless upon first meeting him at the prison who he was (at which time Henderson says Loveless recognized him) and that he (Henderson) had been involved in the initial investigation in Kodiak. Henderson said that he was in Loveless' company for approximately eighteen hours and that from the beginning Loveless tried to talk about the case despite Henderson's telling him that they should not talk about it, specifically warning Loveless that Loveless had an attorney and that anything Loveless said to Henderson would be repeated in court if Henderson were asked. Despite these warnings, Loveless told Henderson that he "hated the district attorney," that he was "framed by the district attorney," that the gun the prosecutor had wasn't the right gun, and that he had thrown the right gun into the bay. Most of this testimony was related to the jury over objection.

The trial court denied the motion on the apparent ground that the statements were volunteered (*i. e.*, that any privilege was waived) and were not the product of interrogation. Subsequent to the trial of this case, the United States Supreme Court decided *Rhode Island v. Innis*, 446 U.S. 291, 101 S.Ct. 1682, 64 L.Ed.2d 297 (1980), clarifying what that court means by custodial interrogation for purposes of *Miranda*. There the court held that interrogation includes express questioning or its functional equivalent:

> That is to say, the term "interrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

*Id.* at 301, 100 S.Ct. at 1689, 64 L.Ed.2d at 308 (footnotes omitted).

The court added,

> *Massiah* was not in custody. By contrast, the right to counsel at issue in the present case is based not on the Sixth and Fourteenth Amendments, but rather on the Fifth and Fourteenth Amendments as interpreted in the *Miranda* opinion. The definitions of "interrogation" under the Fifth and Sixth Amendments, if indeed the term "interrogation" is even apt in the Sixth Amendment context, are not necessarily interchangeable, since the policies underlying the two constitutional protections are quite distinct. See Kamisar, *Brewer v. Williams, Massiah, Miranda*: What is "Interrogation"? When Does it Matter? 67 Geo.L.J. 1, 41–55 (1978).
>
> On remand Loveless may present his sixth amendment arguments to the trial court, and if he does, we hope that court will in its finding resolve any factual disputes, address the issues presented by *Innis* (fifth amendment) and *Brewer* (sixth amendment), and make separate conclusions of law in regard to them. *See also* Grano, Rhode Island v. Innis: A need to Reconsider the Constitutional Premises Underlying the Law of Confessions, 17 Am.Crim.L.Rev. 1 (1979) (*passim*).

The record before the trial court does not establish that the sixth amendment issue was fully raised. All parties should recognize that the fifth and sixth amendments present different issues that should be separately addressed. As the U. S. Supreme Court said in *Rhode Island v. Innis*, 446 U.S. 291, 300 n.4, 100 S.Ct. 1682, 1689 n.4, 64 L.Ed. 297, 307 (1980):

> There is language in the opinion of the Rhode Island Supreme Court in this case suggesting that the definition of "interrogation" under *Miranda* is informed by this Court's decision in *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424. [Citation omitted.] This suggestion is erroneous. Our decision in *Brewer* rested solely on the Sixth and Fourteenth Amendment right to counsel. [Citation omitted.] That right, as we held in *Massiah v. United States*, 377 U.S. 201, 206, 84 S.Ct. 1199, 12 L.Ed.2d 246, prohibits law enforcement officers from "deliberately elicit[ing]" incriminating information from a defendant in the absence of counsel after a formal charge against the defendant has been filed. Custody in such a case is not controlling; indeed, the petitioner in

Any knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor in determining whether the police should have known that their words or actions were reasonably likely to elicit an incriminating response from the suspect.

*Id.* at 302 n.8, 100 S.Ct. at 1690 n.8, 64 L.Ed.2d at 308.

At trial, Loveless stressed his psychiatric problems as rendering him vulnerable, but he argued primarily that a defendant in custody cannot "waive" the *Miranda* protection in the absence of counsel, *i. e.,* he simply cannot be interrogated. Citing *People v. Hobson,* 39 N.Y.2d 479, 384 N.Y.S.2d 419, 348 N.E.2d 894 (1976), and *People v. Arthur,* 22 N.Y.2d 325, 292 N.Y.S.2d 663, 239 N.E.2d 537 (1968).[11] The trial court did not reach this issue since it found no interrogation took place.

At oral argument, Loveless broadened his attack to allege that the state had reason to expect that Loveless would talk to Henderson more readily than another officer because Loveless had written letters to the district attorney and other state officials claiming that Henderson, who had conducted the initial investigation in Kodiak but did not testify at trial, would have exoner-

ated Loveless had he testified. Consequently, defense counsel argued that given Loveless' psychiatric problems, the state knew or should have known that presenting Loveless with Henderson would elicit incriminating statements without regard to any cautions which Henderson would give or questions he would ask. This argument was not made at trial, and it rests on factual assertions not supported in the record. Nevertheless, this case must be remanded for retrial, and we believe that the parties and the trial court should have an opportunity to address the entire issue of fifth and sixth amendment rights under the standards established in *Innis* and *Brewer* —standards which we hereby adopt as appropriate under our state constitution as well. Consequently, we reverse and remand for a new trial and such additional pretrial proceedings as are consistent with this decision.

REVERSED.

---

11. Defendant also cited *United States v. Thomas,* 474 F.2d 110 (10th Cir. 1973), *cert. denied,* 412 U.S. 932, 93 S.Ct. 2758, 37 L.Ed.2d 160 (1973), for the proposition that questioning of a suspect by police after the suspect is represented by an attorney without the attorney's permission violates ABA Code of Professional Responsibility, DR 7–104(A)(1), which bars communication between an attorney and an opposing party represented by counsel without counsel's knowledge and precludes use of any statement elicited over objection regardless of an effective waiver of *Miranda* rights by the defendant. The *Thomas* rule was applied pro-

spectively, and Thomas' conviction was affirmed. Assuming without deciding that the *Thomas* rule applies in Alaska, *cf. Roberts v. State,* 458 P.2d 340 (Alaska 1969) (conviction reversed where defendant charged with forgery was required to give handwriting exemplars to police despite his request that his attorney first be contacted), it would only apply to statements elicited by interrogation under the *Innis* test. Here the trial court found no interrogation. If this determination is sustained on remand, then *ipso facto* there was no ABA Code DR 7–104(A)(1) violation.