# District of Columbia
# Court of Appeals

No. 13-CF-1131

KEVIN YOUNG,



JUL 28 2016

DISTRICT OF COLUMBIA
COURT OF APPEALS

Appellant,

v.                                                          CF2-17496-12

UNITED STATES,

Appellee.

On Appeal from the Superior Court of the District of Columbia
Criminal Division

BEFORE:   WASHINGTON, *Chief Judge*; BECKWITH, *Associate Judge*; and REID, *Senior Judge*.

## J U D G M E N T

This case came to be heard on the transcript of record and the briefs filed, and was argued by counsel.  On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that appellants conviction for possession with intent to distribute ("PWID") is affirmed.  The case is remanded to allow the trial court to vacate appellant's conviction for possession of liquid PCP.

For the Court:

JULIO A. CASTILLO
Clerk of the Court

Dated:  July 28, 2016.

Opinion by Associate Judge Corinne Beckwith.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-CF-1131

FILED 7/28/16
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

KEVIN YOUNG, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF2-17496-12)

(Hon. Michael Ryan, Trial Judge)

(Argued April 14, 2015                           Decided July 28, 2016)

*Cecily Baskir* for appellant.

*Kristina L. Ament*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney at the time the briefs were filed, and *Chrisellen R. Kolb* and *Kara Traster*, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, *Chief Judge*, BECKWITH, *Associate Judge*, and REID, *Senior Judge*.

BECKWITH, *Associate Judge*:  After police officers discovered two partially filled vials of liquid PCP in the driver-side door of appellant Kevin Young's SUV, Mr. Young was arrested and charged with possession of a controlled substance

with intent to distribute (PWID) and possession of liquid PCP. *See* D.C. Code §§ 48-904.01 (a)(1), (d)(2) (2012 Repl.). Before trial, Mr. Young's nephew Maurice Young[1] indicated that if he were granted immunity from criminal charges, he would testify that he was the last person to have driven the vehicle. The Attorney General of the District of Columbia declined to grant Maurice immunity from any charges related to drug possession and underage drinking, and in a *Carter* proceeding regarding the reasonableness of that decision, *see Carter v. United States*, 684 A.2d 331 (D.C. 1996) (en banc), the trial court ruled that no reasonableness inquiry was required because Maurice's testimony was not "clearly exculpatory." Mr. Young was ultimately convicted after a trial in which Maurice invoked his Fifth Amendment rights when asked if he had been the last driver of the vehicle. Mr. Young contends that the trial court erred by ruling that the testimony was not clearly exculpatory. We agree that the proffered testimony was exculpatory, but we affirm the trial court's ruling because the proffered testimony was not material. We also conclude that the government provided sufficient evidence of Mr. Young's intent to distribute to support his PWID conviction, but we remand for the trial court to merge Mr. Young's convictions for PWID and possession of liquid PCP.

---

[1] To avoid confusion, we will refer to appellant Kevin Young as Mr. Young and to his nephew as Maurice.

## I.

According to the evidence at trial, in October 2012, Metropolitan Police Department Officer Christopher Clayton responded to a disorderly conduct call regarding a man and a boy who were arguing at an apartment building in the southeast quadrant of the District. The officer approached the two, who were later identified as Mr. Young and his nephew Maurice, to ask them "what was going on" and to determine "[i]f any crime had occurred." The officer noticed a white SUV "just in a parking lot, all by itself, with the engine running," and another officer on the scene, William Hawkins, went to "check out" the car. Using his flashlight to peer into the car, Officer Hawkins spotted a belt with an empty gun holster and handcuff case in the back seat of the car and two vials in the driver-side door handle. Officer Hawkins went back and whispered this information to Officer Clayton, and Officer Clayton asked Mr. Young if he was a police officer. According to Officer Clayton, Mr. Young said he was not, and that he had just found those items. Mr. Young admitted that it was his vehicle and that he "just drove up."

Mr. Young then walked over to the vehicle with the officers and opened the driver-side door, "immediately plac[ing] his left hand over the two vials by the door handle." The officers noticed a smell that they recognized as PCP. Officer Clayton asked Mr. Young what he was covering up, and after answering "oils,"

Mr. Young was arrested and handcuffed. Officer Clayton then noticed that the vials held an amber liquid, which (as the parties stipulated at trial) contained 5.6 grams of liquid PCP.

Prior to trial, Mr. Young moved to suppress the PCP and the statements he made during the encounter, but the trial court ruled that the officers did not engage in custodial interrogation within the meaning of the Fifth Amendment and that Mr. Young had voluntarily opened the car door, which led the officers to smell PCP and see the vials in plain view. At the suppression hearing, Mr. Young testified that he had driven the car to the apartment with his nephew as the sole passenger. Maurice testified similarly. But on the morning of jury selection, counsel for Mr. Young raised a "*Carter* issue," indicating that Maurice had been the last one to drive the car and that the drugs belonged to him.[2] *See Carter v. United States*, 684 A.2d 331, 344–45 (D.C. 1996) (en banc) (outlining process for judicial review of government's decision not to grant immunity to a "crucial defense witness" who invokes his Fifth Amendment right against self-incrimination). The court appointed counsel for Maurice, who proffered that Maurice would testify that he

---

[2] It appears that counsel for Mr. Young first learned this information that morning when the prosecutor gave him *Brady* material that included an officer's statement that Mr. Young told him on the night of the offense that Maurice was driving and that the drugs belonged to Maurice. *See Brady v. Maryland*, 373 U.S. 83 (1963). Counsel then heard a similar statement directly from Mr. Young.

had driven the SUV on the night in question but that he had no knowledge of the drugs in the SUV. The trial court concluded that Maurice had a Fifth Amendment right against admitting to driving under the influence (DUI) in light of testimony at the suppression hearing that he was intoxicated, and the court also determined that the fact that Maurice was driving "would be significant . . . in a chain [of facts] that could exculpate Kevin Young." The trial court concluded that the *Carter* standard had been met,[3] and so the court asked the prosecutor to confer with the Office of the Attorney General (OAG) to discuss possible immunity for Maurice from DUI charges as well as a potential charge of constructive possession of PCP. The OAG ultimately granted Maurice immunity from charges stemming from DUI and driving without a permit, but it declined to grant him immunity from charges related to drug possession and underage drinking.[4] According to the OAG, Maurice's testimony that he was driving "would be a clear instance of perjury" because he had earlier testified during the suppression hearing that Mr. Young was driving. "We cannot support that," the OAG attorney said.

---

[3] That is, the proffered testimony was "material, exculpatory, non-cumulative evidence, unobtainable from any other source." 684 A.2d at 345.

[4] The OAG, rather than the U.S. Attorney's Office, had the authority to immunize Maurice from the DUI and no-permit charges because it has the responsibility to prosecute D.C. criminal traffic offenses. The OAG had the authority to immunize him from the remaining charges because he was a juvenile.

Mr. Young then moved for sanctions under *Carter*, but the trial court reconsidered the question whether *Carter* applied at all. The court concluded that it had initially applied the wrong standard and that the proffered testimony did not "clearly exculpate" Mr. Young because "the fact that it could tend to inculpate Maurice Young in some sort of joint constructive possession theory doesn't exculpate Kevin Young from the same theory." Because the testimony was not "wholly exculpatory," the court ruled that "*Carter*'s not implicated by it." "The only clear exculpation," the court stated, would be if Maurice testified "the drugs were mine, or I can tell you that the drugs weren't Kevin Young's."

Maurice ultimately testified at trial without immunity from the charges related to drug possession and underage drinking. He asserted his Fifth Amendment rights when asked whether he was the driver or passenger of the car on the last ride with Mr. Young before the police arrived. Maurice also invoked the Fifth Amendment when asked if he "put those drugs in that particular car," but after consulting with counsel, he answered the question "[n]o." On cross-examination, the government introduced Maurice's suppression hearing testimony that Mr. Young had been driving the SUV. On redirect, Maurice testified that his prior testimony was untruthful because he was afraid of being prosecuted, and that he was "now telling the truth and taking the Fifth" because the government would not grant him immunity.

The jury convicted Mr. Young of both PWID and possession of liquid PCP.

## II.

On appeal, Mr. Young first argues that the trial court erred in determining that *Carter* was "not implicated" because Maurice's testimony would not be "clearly exculpatory" to Mr. Young. The parties initially dispute whether *Carter* requires the proffered testimony to be exculpatory or "clearly" exculpatory. In laying out the four-part test, *Carter* uses the former term three times and the latter once, *see generally* 684 A.2d at 340–44, and our cases since have inconsistently used one formulation or the other. *Compare, e.g.*, *Hayes v. United States*, 109 A.3d 1110, 1116 (D.C. 2015) ("exculpatory"), *with Wynn v. United States*, 80 A.3d 211, 220 (D.C. 2013) ("clearly exculpatory"). The parties have not cited, nor have we found, any case in which this court analyzed the distinction or determined that it made a difference to the holding.[5]

---

[5] We found only one published opinion in which the parties disputed whether the testimony was exculpatory. *See Bell v. United States*, 950 A.2d 56 (D.C. 2008). The dispute there was factual, however, rather than legal; appellant proffered that the *Carter* witness would testify that appellant did not commit the crime, but the witness's counsel proffered that he would "not only deny any culpability in the robbery, but also point the finger of blame at appellant." *Id.* at 61–63. The trial court credited the witness's counsel and found that *Carter* was not implicated. *Id.* at 62. In that case, the testimony was clearly *inculpatory*, and so the court had no occasion to analyze whether the proper standard was "exculpatory" or "clearly exculpatory."

*Carter* adopted its four-part test from a Second Circuit case holding that "[d]efense witness immunity is required only upon a showing that '(1) the government has engaged in discriminatory use of immunity to gain a tactical advantage or, through its own overreaching, has forced the witness to invoke the Fifth Amendment; and (2) *the witness'[s] testimony will be material, exculpatory and not cumulative and is not obtainable from any other source*.'" *Carter*, 684 A.2d at 340 (quoting *United States v. Rivera*, 971 F.2d 876, 887 (2d Cir. 1992)). The *Carter* majority emphasized that its rule "emanates from settled law that the government has a constitutional duty to volunteer exculpatory evidence to a criminal defendant." *Id.* at 344 (citing *United States v. Agurs*, 427 U.S. 97 (1976), and *United States v. Bagley*, 473 U.S. 667 (1985)). Both *Agurs* and *Bagley* involve applications of the *Brady* doctrine, under which due process is violated when the prosecutor suppresses "evidence favorable to an accused . . . where the evidence is material either to guilt or punishment." 373 U.S. at 87.

It is therefore clear that the *Carter* majority intended the word "exculpatory" in its four-part standard to mean the same thing as in the *Brady* context.[6]

---

[6] "Favorable" evidence under *Brady* includes impeachment evidence "as well as exculpatory evidence," *see Bagley*, 473 U.S. at 676, although the *Carter* court clarified that "the defendant's proposed witness must be offering exculpatory evidence in order to begin to come within the rationale of this opinion." *Carter*, 684 A.2d at 344 n.17.

Exculpatory evidence under *Brady* is that evidence that "tends substantively to negate guilt." *Love v. Johnson*, 57 F.3d 1305, 1313 (4th Cir. 1995).[7] We therefore disagree with the contention that the evidence must completely or wholly exculpate appellant to be considered "exculpatory." The proffered testimony here was favorable to Mr. Young, and thus exculpatory, because it established that another person was the most recent occupant of the driver's seat where the drugs were found and thus increased the likelihood that the drugs did not belong to Mr. Young. No more was required to meet this prong of the test.

The government argues, alternatively, that we may affirm Mr. Young's convictions on the ground that the OAG's decision not to immunize Maurice was reasonable because "this case involved such clear indications that Maurice Young intended to perjure himself at appellant's trial." We stated in *Carter* that a "threat

---

[7] Some courts have defined exculpatory evidence in a manner that conflates it with materiality. *See Mays v. City of Dayton*, 134 F.3d 809, 815 (6th Cir. 1998) ("[E]xculpatory evidence [is] defined as material evidence that would have a bearing upon the guilt or innocence of the defendant." (citing *Brady*, *Agurs*, and *Bagley*)). Our case law makes clear that favorability and materiality are distinct concepts. *See Vaughn v. United States*, 93 A.3d 1237, 1244 (D.C. 2014) (stating that under *Brady*, "the government has a constitutionally mandated obligation to disclose to the defense, prior to trial, information in the government's actual or constructive possession that is favorable and material"); *Miller v. United States*, 14 A.3d 1094, 1109 (D.C. 2011) (confirming that there is a duty to disclose favorable evidence "even when the items disclosed subsequently prove not to be material" (citing *Boyd v. United States*, 908 A.2d 39, 59-60 & n.31 (D.C. 2006))).

of a blatant perjury . . . may sometimes be so apparent as to be demonstrable to the trial judge [that] the government could not reasonably be expected to cloak in advance such testimony with immunity." 684 A.2d at 342. We do not share the government's confidence that Maurice's proffered trial testimony would constitute perjury. At the outset, while Maurice indicated he would testify at Mr. Young's trial contrary to his testimony at the suppression hearing, he offered a plausible explanation for the discrepancy, and it is not at all obvious that Maurice's proposed trial testimony was the untrue account. But even leaving that question aside, the record reflects some ambiguity—only exacerbated by Maurice's apparent cognitive limitations[8]—about whether Maurice grasped the questions he was asked and therefore whether he believed he was giving false testimony at the suppression hearing or later believed his proposed trial testimony would be false.[9] *See In re*

---

[8] The trial court commented on these issues at a pretrial hearing, stating, "I don't know what's going on with Maurice Young, but he is the first person I've ever run into that didn't know how old he was, and it didn't seem like he was trying to—it didn't seem like he was intentionally not telling the truth." Defense counsel likewise stated that Maurice "has an interesting way of understanding his birthday. He believes each year he goes up. And his birth date goes back, which is why sometimes he is born 1993, sometimes he is born in '94 and sometimes born in '95."

[9] *Compare* Suppression Hr'g Tr. at 50-51 ("Q. And you didn't use that car to get to that apartment that day, did you? A. No."), *and* ("Q. You didn't drive in the Oldsmobile to that – to the apartment, correct? A. Yes."), *with id.* at 53-54 ("Q. And how did you get there, Mr. Young? How did you get to 5109 F Street? A. We drove there. Q. When you say we, who are we? A. Me and my Uncle

(continued…)

*White*, 11 A.3d 1226, 1273 (D.C. 2011) ("Perjury is proven if the evidence shows that 'the accused testified falsely and that he did not, at the time, believe his testimony to be true.'" (alterations omitted) (quoting *Boney v. United States*, 396 A.2d 984, 986 (D.C. 1979))). On these facts, we cannot say that the government's refusal to immunize Maurice was grounded in "clear indications of potential perjury." *Carter*, 684 A.2d at 342.

Further, consistent with *Carter*'s purpose in balancing the defendant's Sixth Amendment right and the witness's Fifth Amendment right, the questions whether the denial of immunity is reasonable and whether sanctions against the government are appropriate rely in part on "whether there will be a distortion of the fact-finding process" should the government deny immunity. 684 A.2d at 345. Here, the government's refusal to immunize Maurice may have contributed to such a distortion when, after Maurice invoked the Fifth Amendment in response to the question whether he was driving the SUV, the government introduced his suppression hearing testimony about who was driving the vehicle and argued,

---

(…continued)
Kevin. Q. And who drove there? A. My uncle."). As Mr. Young states in his reply brief, by the time Maurice was asked "And who drove there?," he had been "asked multiple variations of the same question," and the questions were not precise about whether "driving" or "using" the car meant that Maurice was actually operating the car or merely riding in it as a passenger.

based on that testimony, that Kevin Young had been driving. As a result, unless Maurice waived his Fifth Amendment privilege against self-incrimination to disavow his earlier testimony, the trial record in Mr. Young's case would be "distorted" because the jury would hear only one side of the story—Maurice's testimony that Mr. Young was the driver. The *Carter* process was designed to alleviate this tension between Maurice's and Mr. Young's constitutional rights, and the government's actions in this case—refusing to immunize Maurice and then presenting his earlier testimony contrary to the testimony he was withholding pursuant to the Fifth Amendment—exacerbated this tension. Maurice was put into a difficult situation on redirect where he continued to assert the privilege but admitted his suppression hearing testimony was false, essentially asking the jury to draw a negative inference from his invocation. *See* Tr. 7/19/13 at 31-32 (responding to counsel's question whether he was "now telling the truth and taking the Fifth"). In essence, where *Carter* seeks to balance the defendant's and the witness's rights, thereby protecting both, the government's introduction of Maurice's prior testimony had the opposite effect: Maurice was forced to admit to a crime *and* Mr. Young was unable to argue that Maurice was the driver of the car so the jury should have a reasonable doubt that he possessed the PCP found in the driver-side door.[10] Given this concern at trial, our uncertainty about the

---

[10] During closing argument, defense counsel argued (among other things)

(continued…)

government's perjury contention, and the fact that the trial court never ruled on the reasonableness or unreasonableness of the OAG's decision not to immunize Maurice, we decline the government's invitation to affirm on this alternate basis.

We may nonetheless affirm the trial court ruling that *Carter* was "not implicated" on these facts on any other basis apparent from the record as long as the appellant does not suffer "procedural unfairness—that is, that she has had notice of the ground upon which affirmance is proposed, as well as an opportunity to make an appropriate factual and legal presentation with respect thereto." *In re Walker*, 856 A.2d 579, 586 (D.C. 2004). Here, the parties' briefing devoted ample attention to whether the proffered testimony was "clearly exculpatory," as the government put it, or whether the testimony would "introduce some reasonable doubt about whether Mr. Young had constructive possession of the drugs," in the words of Mr. Young. In fact, Mr. Young argued that the evidence that Maurice was driving would "be enough to create reasonable doubt for a reasonable jury as to whether Mr. Young—as a recent passenger in the car—had the necessary ability

---

(…continued)

that because Maurice invoked the Fifth Amendment in response to the question whether he was the last driver of the vehicle, there was "a reasonable doubt," but he could not explain exactly why or how, and the trial court properly sustained an objection to defense counsel's statement that because Maurice pleaded the Fifth "you [the jury] can infer that he has something to hide." *See Martin v. United States*, 756 A.2d 901, 905 (D.C. 2000).

and intent to exercise dominion and control over the drugs—an element necessary to prove both the possessory offenses with which he was charged." This argument, in our view, sounds in "materiality," which as noted above is a separate component of the four-part *Carter* test. If Maurice's proffered evidence was not material within the meaning of *Carter*, we will affirm the trial court's ruling that *Carter* was "not implicated" on these facts.[11]

Under the *Brady* doctrine—and therefore under *Carter*, as it incorporated the *Brady* standard—evidence is material if "there is a reasonable probability that . . . the result of the trial would have been different" had the evidence been presented. *Bagley*, 473 U.S. at 684. Here, we conclude that Maurice's proffered testimony that he was the last driver would not give rise to a reasonable probability of a

---

[11] While in its brief the government analyzes the effect of the *Carter* ruling in terms of harmlessness rather than materiality, resolving this matter on materiality grounds enables us to analyze the disputed components of *Carter*'s four-part test and avoids the illogic of an approach that implicitly assumes that the materiality requirement is met while undertaking a nearly identical harmlessness inquiry. The respective approaches would in any event lead to the same result on the facts of this case. *See Wonson v. United States*, No. 12-CF-1433, slip op. at 19 (D.C. Apr. 14, 2016) (amended July 21, 2016) ("But assuming that the government should have disclosed the full report . . . to the defense prior to trial, Mr. Wonson has no *Brady* claim on appeal. Our conclusion, with the benefit of hindsight, that the admission of the bullet evidence was harmless, likewise compels a conclusion that this report would not have satisfied the materiality component of a successful *Brady* claim."); *see also id.* n.25 ("This conclusion has no bearing on the government's disclosure obligations pretrial.").

different outcome in Mr. Young's case.[12]  As an initial matter, although Maurice invoked the Fifth Amendment rather than testify that he had been driving the vehicle, the jury heard him disavow his prior testimony that he was not the vehicle's driver.  And even assuming Maurice was the driver, the government presented considerable evidence of Mr. Young's "ability and intent to exercise dominion and control over the drugs," including that Mr. Young (1) was riding in a car that smelled of PCP, (2) covered up the PCP when the door was opened, and (3) asserted (incorrectly) that the vials contained "oils."  Moreover, Mr. Young claimed ownership of the car and Maurice denied ownership of the drugs.  In these circumstances, we are persuaded that Maurice's proffered testimony was not material within the meaning of *Carter*[13] and that the trial court did not err in

---

[12]  Mr. Young does not argue that evidence that Maurice was the driver would affect the government's ability to prove intent to distribute.  We discuss the evidence to support that element of the PWID charge *infra*.

[13]  While *Brady* materiality determinations are usually made post-trial based upon a review of the record of the trial that played out in the absence of the *Brady* evidence, *see In re Kline*, 113 A.3d 202, 208-09 (D.C. 2015), trial courts that resolve *Carter* issues prior to or during trial evaluate the materiality of the testimony at issue based upon proffers and any other evidence that has been presented at the time.  Here, while the evidence at trial inevitably informs our conclusion that Maurice's testimony was not material, we note that much of that evidence—including the fact that Mr. Young was riding in a car that smelled of PCP, that he claimed ownership of the car, that he sought to hide the PCP, and that he inaccurately described the vials as containing "oils"—was presented at the suppression hearing and was known to the trial court when it made its *Carter* ruling.  *But see Vaughn*, 93 A.3d at 1262 n.29 (noting that generally "[t]he

(continued…)

concluding that *Carter* was "not implicated" on these facts.

## III.

Mr. Young next argues that the record contains insufficient evidence of intent to distribute to support that element of the PWID charge. We overturn a conviction if "the evidence, when viewed in the light most favorable to the government, is such that a reasonable juror must have a reasonable doubt as to the existence of any of the essential elements of the crime." *Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc) (quoting *Curry v. United States*, 520 A.2d 255, 265 (D.C. 1987)).

Mr. Young possessed a very small amount of PCP—only six milliliters of liquid, 5.6 grams total, 21.5% (1.2 grams) of which was PCP. It was contained in two half-ounce glass vials that were each a quarter full. The government presented the expert testimony of MPD Officer Joseph Abdalla, who explained that in his experience, half-ounce glass vials are "usually" purchased by street dealers for $220 from midlevel dealers, and street dealers then take the vials and stand "in an open air market," where they can earn $450 to $500 distributing the liquid to

---

(…continued)
materiality assessment this court conducts on appellate review is necessarily different from the materiality assessment" that can be made pretrial).

customers who dip cigarettes in the PCP solution and smoke them.[14] Officer Abdalla opined that the vials in this case were "identical to the half-ounce vials which a street dealer purchases." He further indicated that he had learned from the experience of undercover police officers that "[y]ou can't walk up on the street corners and ask to b[u]y a wholesale quantity such as half-ounces and ounces of PCP."

This evidence is sufficient for a reasonable jury to infer that Mr. Young intended to distribute the liquid PCP found in his car. *See In re W.R.*, 52 A.3d 820, 822 (D.C. 2012) (noting that the "packaging of narcotics" can provide evidence of intent to distribute). Even though the small amount of drugs could have been consistent with personal use,[15] "relatively small amounts of drugs may be sufficient to further prove that the drugs are for sale" when "their packaging is suited for distribution." *Rivas*, 783 A.2d at 147.

---

[14] *See Scott v. State*, 808 P.2d 73, 76 (Okla. Crim. App. 1991) (noting that vials "are used in the trade for dipping cigarettes in single doses for sale").

[15] Officer Clayton, the arresting officer, swore in the criminal complaint that the amount of PCP seized had an approximate street value of $4,200 and was enough for approximately 170 dippers. Officer Abdalla's expert testimony indicated it was enough for only nine dippers, a street value of $180.

**IV.**

Mr. Young argues that his convictions for possession of liquid PCP and PWID should merge under the Double Jeopardy Clause of the Fifth Amendment. The government does not object to merger in this case, and we agree that merger is proper.

"Discerning legislative intent is key in determining whether offenses merge, as 'the question of what punishments are constitutionally permissible is not different from the question of what punishments the Legislative Branch intended to be imposed.'" *Graure v. United States*, 18 A.3d 743, 765 n.31 (D.C. 2011) (quoting *Byrd v. United States*, 589 A.2d 386, 388-89 (D.C. 1991)). The legislative history of the Liquid PCP Possession Amendment Act of 2010 shows that the D.C. Council intended to create an "exception" for liquid PCP to the general rule that simple possession of a controlled substance is a misdemeanor. D.C. Council, Report on Bill 18-556 at 1 (Apr. 13, 2010). This provision essentially acts as a penalty enhancement for possession of PCP when the drug is in liquid form, and the Council did not demonstrate any intent to abrogate the well-accepted principle that possession is a lesser-included offense of PWID. *See Brockington v. United States*, 699 A.2d 1117, 1120 (D.C. 1997). In fact, the committee report indicates that the Act "is targeted at mere possession of liquid

PCP," so "the penalty should be lower than that of possession with the intent to distribute other drugs, such as marijuana." Report on Bill 18-556 at 8.

In addition, one of the two reasons the Council gave for this enhancement was that "possession of liquid PCP is rarely consistent with personal use" because PCP "typically is distributed as a liquid but not consumed in that form." Report on Bill 18-556 at 1, 5. If the Council intended to target possession of liquid PCP because it often indicates intent to distribute, it would be peculiar for the Council to have also intended for defendants to be separately convicted of PWID. It appears instead that the Council recognized that in many cases it is difficult for the government to prove intent to distribute, so it increased the penalty for mere possession of liquid PCP to "enable the District to better address the fight against PCP—a dangerous and destructive drug—by going after the distributors." *Id.* at 6.

Mr. Young's conviction for PWID is affirmed. We remand to allow the trial court to vacate his conviction for possession of liquid PCP.

*So ordered.*